# THE STATE v. ROBERT BOATRIGHT, ED E. ELLIS AND BERT BRUMLEY, Appellants.

## Division Two, May 31, 1904.

1. **LARCENY.** Without a taking and carrying away there can be no larceny.

2. ————: **Money Deposited as Guaranty: Turned Over to Betters: Conspiracy.** The prosecuting witness testified that $6,000 had been placed in his hands as stakeholder in a foot race, and that he deposited it in a bank in his own name, and voluntarily put up his own drafts on the money realized thereon with the bank as a guaranty that he would turn over the stake money to the winners of the bet, which turned out to be the defendants, and that after he had turned over the $6,000 to them, he asked the cashier to take down his drafts for $3,000, and the cashier stated to him that it was reported that he had lost everything he bet, and that he replied he had not bet a dollar, but the cashier did not give him his money. *Held,* that this evidence, by no sort of construction, can be held to mean that the cashier said he had turned the witness's money over to the defendants, and that the only way a larceny can be charged against them is by showing that they and the cashier had entered into a conspiracy to take his money after he deposited it in the bank. And there being no evidence of any criminal conspiracy between these defendants and the cashier, whose possession was originally lawful, the judgment against them is reversed, because there is no showing of a taking by them or by the cashier for them.

3. ————: **Conspiracy: Unindicted Conspirator.** The conspiracy being shown, the statements of an unindicted conspirator are binding against those indicted.

4. ————: **Instruction: Comment on Evidence.** An instruction that makes the guilt of the defendants depend on the belief of the jury that the money which they are charged with stealing was obtained "by the means and in the manner and under the circumstances detailed" by the two prosecuting witnesses, is equivalent to a comment on the evidence.

5. ————: ————: **Founded on Wrong Hypothesis.** But the most serious objection to that instruction is that it furnished no correct basis for a finding of guilt in a larceny case. It should have

told the jury that if they find and believe from the evidence, beyond a reasonable doubt, that defendants obtained possession of the money described in the evidence by some trick, fraudulent device or artifice, with the intention at the time of stealing it, and that defendants after having so obtained possession of said money did appropriate the same to their own use with a fraudulent purpose of depriving the owner of the same, they should find them guilty of grand larceny, etc.

6. ———: **Other Distinct Crimes.** Evidence of other distinct larcenies, committed at least a year after the offense charged, against other parties, under entirely different circumstances and by different means, can not be used to prove the larceny charged.

7. **ARRAIGNMENT: Sufficient Plea.** The information was in two counts, the first charging the obtaining of money by false pretense, and the other grand larceny. And when the court asked the defendants as to their plea to the charge of "having obtained money by false pretense," they specifically pleaded that "they are not guilty in manner and form as charged in the information." *Held,* that they were not placed upon trial for grand larceny without arraignment, their plea sufficiently indicating that they pleaded to the whole information.

Appeal from Lawrence Circuit Court.—*Hon. Henry C. Pepper,* Judge.

REVERSED AND REMANDED.

*Geo. R. Clay, Jos. M. McPherson, Wm. B. Skinner, Edw. J. White, Thos. J. Rowe* and *Martin L. Clardy* for appellants.

(1) The defendants should have been arraigned and made to plead to the specific charge on which they were convicted. The record shows that the defendants were arraigned, both in Jasper and Lawrence counties, upon the sole charge of "obtaining money under false pretenses." State v. Barnes, 59 Mo. 154; State v. Saunders, 53 Mo. 235; 2 Enc. Pl. and Pr., 762; Gaither v. State, 21 Tex. App. 527. (2) The court gave illegal and erroneous instructions to the jury over the defendants' objections and exceptions. 1. The first instruc-

tion is erroneous in telling the jury to find the facts therein specified, in a peremptory manner, and in assuming that there was evidence of a taking and asportation of Griffith's money by the defendants, when there was no evidence of this fact.  2.  The second instruction is erroneous: (a) in not telling the jury that a felonious intent to steal the property was necessary, at the time the defendants acquired it (if they ever did). State v. Lackland, 136 Mo. 30; State v. Moore, 101 Mo. 328.   (b)   It was also erroneous in assuming that there was a taking and asportation by the defendants; (c) in commenting upon the evidence of Griffith and Owen, and (d) in assuming that the evidence of such witnesses was absolutely true, instead of submitting this fact to the jury, the triers of the facts.   3.   The third instruction was not based upon the evidence, as there was absolutely no evidence that Griffith ever bet a cent upon the foot race, but all the evidence was that he was betting Boatright's money and had deposited his in the bank.   Under this instruction, the guilt of the defendants was hypothecated upon a state of facts not shown by the evidence to exist.   (3)   Upon the trial of a person for one offense it is incompetent to prove another and independent offense alleged to have been committed long after the offense for which he is on trial.   The intention of defendants at the time they obtained   possession   of   the   money—if   they   ever obtained the possession—by some trick, fraudulent device or artifice, can not be established by evidence tending to prove that either of them was guilty of some other offense, long after the time of the transactions for which they are herein prosecuted.   People v. Sharpe, 107 N. Y. 466; State v. Fitchette, 92 N. W. 527; State v. Vance, 94 N. W. 204; People v. Hurley, 58 Pac. 814; State v. Kelley, 27 Atl. 203; State v. Williams, 136 Mo. 293.   (4)   The court should have instructed the jury on the question of conspiracy.   State v. Kennedy, 75 S. W. 988; sec. 2627, R. S. 1899.   (5)

There can be no larceny in the absence of an asportation of the property alleged to be stolen. 2 Bishop New Cr. Law (8 Ed.), sec. 794; State v. Koplan, 167 Mo. 298. There is no evidence in this case tending to prove an asportation by the defendants, Boatright, Ellis or Brumley; if the evidence disclosed the commission of any offense, it was embezzlement committed by James P. Stewart. People v. Miller, 169 N. Y. 339; Com. v. Barry, 124 Mass. 325. (6) The second instruction is bad because that instruction in effect told the jury that if they believed Griffith and Owen, then defendants were guilty.

*Edward C. Crow*, Attorney-General, for the State; *H. W. Cury* and *J. W. Halliburton* of counsel.

(1) On a trial for grand larceny under an indictment which charges defendants alone with the crime and contains no averment of conspiracy between defendants and others to commit the crime, evidence showing the conspiracy is admissible. State v. Kennedy, 75 S. W. 979. (2) Transactions of a kindred character may be proven to show intent and motive and to show conspiracy. Davis v. Vorhes, 141 Mo. 241; Greenleaf on Evidence (16 Ed.), sec. 142; 51 Central Law Journal 368. (3) (a) Under an indictment for grand larceny, a showing that money was obtained in a gambling scheme from a party who had no chance to win, constitutes larceny pure and simple. United States v. Murphy, 48 Am. 754; Miller v. Commonwealth, 39 Am. 194; State v. Skillbrick, 87 Am. St. 784; People v. Shaw, 58 Am. 372. (b) Obtaining money under a pretense that it is to be bet on a race, and with intent at the time to convert it to the bailee's own use, the race being a mere sham to aid this purpose, is larceny, and anyone obtaining possession of money or property by fraud with intent to convert it to his own use, is guilty of larceny. Trick and device and the means need not be set out in

the indictment. Commonwealth v. Flynn, 57 Am. St. 472; Doss v. People, 49 Am. St. 180; Commonwealth v. Lawrence, 25 Am. St. 629; Beazley v. State, 49 Am. St. 418; State v. Murphy, 90 Mo. App. 548; State v. Zumbunson, 80 Mo. 111; People v. Miller, 88 Am. St. 546; State v. Hall, 85 Mo. 669; Loomis v. People, 67 N. Y. 322; People v. Camp, 56 Mich. 548; State v. Edwards, 59 L. R. A. 465. (4) The evidence of the statements of others than those indicted who were shown to be connected with defendants, and made during the time the transactions were taking place, were admissible, there being sufficient evidence to connect them with the conspiracy. State v. Walker, 98 Mo. 95. (5) The evidence on the part of the State was to the effect that the prosecuting witness did not intend to and did not part with the title to the $900. He put it up with Stewart as security for the $3,000 held by him. Under the law of false pretenses, the prosecuting witness must intend to pass title to the property. Otherwise it is larceny. McLain's Crim. Law, sec. 563.

GANTT, P. J.—On the twenty-seventh day of March, 1902, in the circuit court of Jasper county, Missouri, the above-named defendants, together with James P. Stewart, Stewart Cockrell and Jerry Cockrell, were charged, upon the information of the prosecuting attorney of Jasper county, with having obtained the sum of four thousand dollars from one M. Griffith by means of false pretenses upon the—day of——,1900, and in a second count with larceny of a like amount on the nineteenth day of December, 1900. A change of venue was granted these three defendants to Lawrence county, and to J. P. Stewart to Barton county. Before granting the change of venue the circuit court of Jasper county caused the defendants to be arraigned. As a point is

made on the arraignment, we insert the proceedings as they appear of record.

"State of Missouri, plaintiff, vs. Robert Boatright, defendant.

"Now comes the prosecuting attorney for the State and also comes the defendant, Bert Brumley, in person and in open court, whereupon the said defendant is duly informed by the court that he stands charged upon the information filed herein against him by the prosecuting attorney of Jasper county, charging him with the crime of 'obtaining money under false pretenses.' And being now inquired of how he will acquit himself of said charge for plea thereto the defendant says he will waive all rights to an arraignment herein and enters his plea of not guilty as charged in the information, and of this he puts himself upon the county and the prosecuting attorney doth the like."

The same form of arraignment was had in reference to the defendant Ed Ellis. No arraignment of Boatright appears in the record of the Jasper circuit court.

After the cause was transferred on change of venue to Lawrence county, these three defendants were jointly arraigned on the seventeenth of March, 1903, in the following manner:

"State of Missouri, plaintiff, vs. Robt. Boatright, Ed E. Ellis and Bert Brumley, defendants. No. 2635. Obtaining money under false pretenses.

"Now at this day comes A. H. Redding, prosecuting attorney for Jasper county, Missouri, who prosecutes herein, and also come the defendants herein, Robert Boatright, Ed E. Ellis and Bert Bromley, in their own proper persons and by attorney; and waive the reading of the information, and they now being inquired of by the court as to their plea to the charge of 'having obtained money under false pretenses' whereof they stand charged, they say that they are not guilty in manner and form as charged in the information."

In the Lawrence court before proceeding to trial

the defendants filed their motion to quash the informa-
tion because the first count charged no offense, and the
second count was vague and indefinite and did not in-
form the defendants of the nature of the charge against
them.

This motion was overruled and defendants duly ex-
cepted. The court proceeded to trial and at or near the
close of the evidence, the State voluntarily dismissed as
to the first count, and defendants were convicted of
grand larceny and each sentenced to the penitentiary for
three years.

Confining ourselves for the present to the evidence
tending to prove the particular larceny alleged in the
indictment, the testimony tended to establish the follow-
ing facts:

Monroe Griffith, the prosecuting witness, and John
Owens, on or about the eleventh day of October, 1900,
were citizens of Kansas. They resided near each other,
and near Ranton, Franklin county, in said State. Griffith
was acquainted with two young men, Jerry Cockrell
and Stewart Cockrell, who lived in Linn county, Kansas,
about seven miles from the farm of witness. Witness
was the owner of a farm of four hundred acres. Wit-
ness is a farmer and stock dealer. About the tenth of
October, 1900, the two Cockrells went to Griffith's farm
and told him of the Webb City Athletic Club. The
Cockrells had some local reputation as foot-racers. They
told him they were going to run a foot-race at Webb
City, and desired Griffith to go down and hold the stakes.
Jerry Cockrell said he had run a great many races for
the Athletic Club, and they hadn't paid him, and they
were going to arrange a fifty-yard race. They induced
him to go down.

They wanted one of his boys to go also, but he told
Jerry he wouldn't allow his boy to mix up in anything
of that kind, and at first told them that he couldn't go,
but three or four days later he met Stewart Cockrell at
Lane, Kansas, and he insisted on witness going, and he

consented and asked his friend Owens to go along with him. They said it didn't require any money; that they could furnish plenty of money and didn't want him to bet anything. Stewart Cockrell paid all the expenses, railroad fare, etc., for both Griffith and Owens from Lane, Kansas, to Webb City. Owens loaned Stewart the money to pay their fare. Griffith says that he had never spoken to Stewart or Jerry Cockrell until they came to his farm about the tenth and requested him to go down and act as stakeholder. They only stayed ten or fifteen minutes. Jerry said he had to go to Webb City that night. Witness drove on to Lane next day and met Stewart Cockrell there and he again asked him to go and he finally consented. Stewart Cockrell was to pay the expenses and said he would pay for Griffith's time. This witness stated in substance that Stewart and Jerry Cockrell told him that they had a scheme to get even with the club; they hadn't treated Jerry right. Stewart was to win the race; that Boatright told him the same practically. On the eleventh of October, 1900, Griffith, Owens and Stewart Cockrell arrived at Webb City; to carry out these plans, Jerry Cockrell had preceded them. Griffith says they met Boatright outside of the limits of Webb City, and there the plan was laid by which Stewart Cockrell was to beat Jerry and win Ellis's money. Ellis had already agreed to bet on Jerry. They then went to the "16 to 1" saloon and there Owens or one of the party inquired if they had anyone in that town "who could run a little." Stewart Cockrell was dressed as a green country boy. Jerry was then ushered into the room and a mock introduction was gone through. The witness Griffith says the betting ran high, Ellis betting on Jerry and Stewart Cockrell on himself with money furnished him by Boatright. Ellis and Stewart Cockrell bet $3,000 each on the race, and put the stakes in Griffith's hands as stakeholder. Thereupon Ellis said Griffith was a stranger to him and ought to put up some security that he would pay over the stakes to

the winner.   Thereupon Griffith went to the Exchange
Bank and made a draft on the bank at Ottawa, Kansas,
for $2,000, and had Mr. Stewart, the cashier, wire if it
would be honored, and when advised it would be ac-
cepted, this draft and $900 in cash and a check of Owens
for $100 were deposited, Griffith says, as a guaranty.
Griffith then also deposited the $6,000 stakes in the bank.
Next morning they got up another bet of $1,000 on the
side, and Griffith wired to his bank at Lane, Kansas, and
his draft for another $1,000 was honored and deposited
with the bank.   That afternoon the race between Jerry
and Stewart Cockrell was run and Jerry won.   After
the race was over, Ellis said to Griffith, "I won the
money."   And Griffith said, "I guess you did, and you
know where it is."   Thereupon, they went to the bank
and Griffith said to the cashier, "I will take down the
drafts and the money," and Stewart, the cashier, an-
swered, "It is reported here that you lost everything
you bet."   He then told Stewart he had not bet a dollar,
whereupon Boatright and Ellis came in and said he had
bet and lost and made a display of weapons and he and
Owens left.   On cross-examination he said he went to
Webb City to buy cattle, but didn't mention cattle to
anybody while there.   Asked if he hadn't testified he
knew it was not to be a fair race and Jerry was going
to get even with the club because they hadn't divided
fair with him, he stated, "I said I went to hold the stakes
because they wanted some one they (the Cockrells) could
trust.   I answered the question that they told me they
were going to throw the race on Ellis because he hadn't
paid the racer, and they told me that; and I answered
the question, 'why I didn't go and tell Ellis it was a
job to rob him if I was an honest man,' by saying, 'I
didn't pay much attention to it—it wasn't my put in.'
I didn't know what the outcome would be.   I knew what
the scheme was.   I was asked the question if Boatright
told me, 'I had a cinch of winning my money,' by say-

ing, 'Yes, sir.' I knew the race was to be dumped on Ellis and I told him nothing about it."

There is no evidence in the record that Stewart, the cashier, or the bank paid either or all of these defendants the $4,000 put up by Griffith as a guaranty. For aught that appears to the contrary, the bank still holds that money, with notice of Griffith's demand for it before it was paid over.

John Owens corroborated Griffith substantially in all he said, save and except Griffith testified he left the drafts as a guaranty, whereas Owens testifies the drafts were cashed in the bank by Mr. Stewart.

For defendants, Miss Anna Moore testified she was bookkeeper in the Exchange Bank at the time, and distinctly remembered the drafts being presented at the counter by Griffith and Owens. She paid them the money on the drafts and checks handed to her, less exchange and collection charges and they took the money and left with it. The drafts and check were sent out in the usual course for collection. Mr. Owens denied that Miss Moore was the lady in the bank at the time the drafts were cashed.

The State, over the objections and exceptions of defendants was permitted to show five other separate and distinct transactions as follows:

"J. M. Davis—an ex-member of the Kansas Legislature—was permitted to tell how he lost $5,000 on a race between two men named Stansberry and Gillett, in which some of the defendants participated, in August, 1901, or eleven months after the date of the offense charged in the information.

"H. S. Wright, of Cooper, Texas, was also permitted, over the defendants' claim of their rights, to detail the facts connected with a foot-race run in September, 1901, between two men named Landers and Segrist, in which some of the defendants took wholly a different part than they took in the Griffth race.

"R. E. Hobbs, of Oklahoma, was also permitted to

tell all the circumstances of a race he lost money on, in October, 1901—over a year after the time of the crime charged in the information is alleged to have been committed—the participants in the race being two men named Wasser 'and Fisher.

"The evidence of Ed Ellis, taken in one of the civil cases against the defendants, in Jasper county, as to a certain boxing match, gotten up by a man named Williams, was also permitted to be read in evidence to the jury, although the evidence showed that the other defendants were out of the State of Missouri when the boxing match came off and knew nothing at all about it.

"William Barker, a lightning rod agent, from Iowa, was permitted to entertain the jury by the narration of the details of a race he witnessed, and lost some money on, in January, 1902, fifteen months after the time of the alleged offense for which the defendants were being tried, and there was no similarity, either in time, circumstance or parties, between his race and that of the witness, Griffith.

"J. R. Black, of Griswold, Iowa, who admitted, on the witness stand, that he had wagered a jack against a thousand dollars, upon the conviction of defendants, was permitted to tell how two men named Harrington and Kyle had persuaded him down to Webb City on October 5, 1901, a year after the transaction with Griffith, and how he had bet on one of these men, and after he had lost, wired his bank not to pay his drafts, and told the cashier of the Webb City bank to get his money if he could."

The circuit court admitted these different transactions to show the *intent* of the defendants. The defendants moved the court to withdraw all these transactions, but the court overruled their motion and they duly excepted.

I. As the case stands on this appeal it is one of larceny alone. The State dismissed as to the count of ob-

taining money under false pretenses after practically all
the evidence had been heard, and we are not called upon
to determine the sufficiency of that count.   The first and
most serious difficulty we encounter on this record is
whether there was any evidence of a taking and asporta-
tion by these three defendants of the money alleged to
have been deposited by Griffith with Stewart, or the
bank of which he was cashier, as a guaranty of his good
conduct in paying over the money to the winner.   It is
elemental that without a taking and carrying away there
can be no larceny.

Now, we have the testimony of the prosecuting wit-
ness, Griffith, that he voluntarily had Stewart prepare
a telegram to Griffith's bank in Kansas to ascertain if
they would honor his drafts for $3,000; that they an-
swered they would, and thereupon he drew two drafts,
one for $2,000, one day, and on the next day, another
for $1,000, both of which were honored.   It is true he
insists he left the drafts themselves as a guaranty, but
his friend, Mr. Owens, who accompanied him and Miss
Moore, the bookkeeper, both testified the drafts were
cashed.   But conceding that instead of depositing the
drafts themselves he deposited their proceeds in cash as
a guaranty that he would pay over the money to the
winner on the race, it was a voluntary transaction as be-
tween him and the bank.   The bank came into posses-
sion of these funds by his voluntary act and there was
no trespass.   But whatever the legal relation existing
between Griffith and the bank; whatever the character
of the possession thus acquired by the bank there is not
a syllable of evidence that such possession was changed
by turning over said drafts or money or any part of it
by Stewart or the bank, of which he was cashier, to the
defendants, Boatright, Ellis and Brumley or either of
them.   In the statement of counsel for the State it is
said "that J. P. Stewart claimed that it had been re-
ported to him that Griffith had bet his money and check
and draft on the foot-race and had lost the same *and·*

*that he (Stewart) had turned it over to the other par-
ties."* The only two witnesses who testified on this
point were Griffith and Owens. Griffith's version is this:
"Mr. Owens and I went to the bank and I says, 'I will
take down the drafts and the money,' and he (Stewart)
says, 'It is reported here that you lost everything that
you bet.' I told him I never bet a dollar, and then they
came in, and said I had bet and lost and the rest of them
claimed I had bet and lost, and Mr. Owens took me to
one side and we left." On cross-examination he said,
"Then I called at the bank for the $3,000 I had put up,
and the bank said the drafts had gone for collection and
they claimed I had lost the money; thought I told this
last night. I was with the gang in the bank after the
race."

Owens gives this account of what transpired at the
bank after the race: "Griffith went to the bank and
told them to give Mr. Ellis his money and said, 'Now
I will take my currency and drafts.' Then Mr. Stewart
told him it was reported that he had lost his money;
he (Griffith) denied this and after a while they talked
like fight, and we left. Mr. Boatright came in and said,
'You lost your money, boys,' and turned and went out;
then Ellis and Brumley and four or five others came in
and they went to quarreling; when Boatright walked
out, it was the last I seen of him. Mr. Brumley said,
'You are playing the baby act, you know you lost,' and
they were flying around with their pistols showing and
we left."

This evidence by no sort of construction can be held
to mean that Stewart said he had turned Griffith's drafts
and money over to these defendants, even if it could
be held they were bound by Stewart's declaration to
Griffith.

The statement made by Stewart as testified to by
Griffith and Owens did not call for a denial by these de-
fendants that they had received said money, or drafts,

or any part of it. The possession admittedly remained with him until the contrary was shown.

This much we say as to the actual custody of the money and drafts by defendants as shown by this record.

We next inquire, was there such evidence of a conspiracy between Stewart and these three defendants as to make his retention of the property their act and thereby make them guilty of larceny?

We think that it was not essential to charge the conspiracy in the indictment.

In State v. Kennedy, 177 Mo. l. c. 118, the law on this subject was carefully examined and all of this division concurred in holding that the rule was correctly stated by Wharton on Criminal Evidence (9 Ed.), sec. 700, wherein he says, "It makes no difference as to the admissibility of the act or declaration of a conspirator against a defendant, whether the former be indicted or not, or tried or not, with the latter; for the making one a codefendant does not make his acts or declarations any more evidence against another than they were before; the principle upon which they are admissible at all being that the act or declaration of one is the act or declaration of all united in one common design, a principle which is wholly unaffected by the consideration of their being jointly indicted." [Bishop's New Crim. Proc., sec. 1248-9; 3 Greenleaf's Ev. (13 Ed.), sec. 92; Gill v. State, 59 Ark. 422; People v. McKane, 80 Hun 332; People v. McKane, 143 N. Y. 455; Goins v. State, 46 Ohio St. 463; People v. Kief, 126 N. Y. 661.]

Whether jointly indicted or not, the rule is that the proof ought to show prima facie that the conspiracy existed before the evidence of one charged to be a conspirator is admitted against others charged to be coconspirators with him and thereafter the question of the actual existence of such conspiracy submitted to the jury. [State v. Walker, 98 Mo. 95; State v. McGee, 81

Iowa 17, and cases cited; State v. Kennedy, 177 Mo. 119.] Now what evidence is there that Stewart was a co-conspirator with these defendants to put up a gambling scheme to obtain Griffith's money, on the pretense that he was betting on a race which under no possible contingency he could win? Where is the evidence that connected Stewart with these three defendants as a co-conspirator?

To convict these three defendants of larceny it was essential to show either that they individually obtained Griffith's said money by some trick, fraudulent device or artifice with the intention at the time of appropriating it to their own use, or that Stewart as a co-conspirator so received it. It is absolutely clear that the State failed to show that they ever obtained possession of any of the money unless Stewart's possession of the money can be held to have been their act. But no witness connects Stewart with any of the plans and arrangements made prior to the race, nor did the circuit court submit the question of the guilt of these defendants to the jury on the theory of a conspiracy. It is obvious that Griffith voluntarily deposited his money in the Exchange Bank of which Stewart was the cashier. Stewart did nothing to induce him to do so. He placed it in there as a guaranty that he would act impartially as a stakeholder. Stewart was not present when Ellis demanded that Griffith should give him some security that the winner would get his money if he won the race. Stewart's possession then began lawfully. That possession was exclusive. Neither of these defendants had any right to share it with the bank and claimed none. They did not demand the wager even, nor claim a right until Griffith, the stakeholder, directed the bank or Stewart to pay it over to Ellis. If as Griffith claims his deposit of $3,000 in drafts and $900 in cash was a guaranty that the wager would be paid over and was not included in any of the bets, but was independent of the bets, then Stewart and his bank alone are responsible to Griffith.

The possession of the bank or Stewart was not shared by these defendants, nor was it to be according to any of the evidence.

When the bank and Stewart, the cashier, were notified that Griffith had not bet anything, and a demand was made that the bank return to Griffith the money deposited wholly as a guaranty, and Griffith had directed the stakes that were put up by Ellis and Stewart Cockrell to be paid over, then the bank had no other claim for longer holding his money, but upon no sort of reasoning can it be maintained that these three defendants were jointly liable with the bank to restore Griffith his money. He had not entrusted it to them. He himself selected the bank as a disinterested bailee. He left his money and drafts with the bank on his own account and was entitled to look to the bank for its return when the obligation he had assumed as stakeholder had terminated by turning over the stakes. We have been unable to find anything in this record to establish a criminal conspiracy between Stewart and these three defendants. If Stewart or his bank wrongfully or criminally retains Griffith's money, then the bank and Stewart must respond but not jointly with these three defendants. We do not say Stewart would be guilty of larceny in failing to pay over the money deposited with him because it is admitted he obtained it lawfully by the voluntary act of Griffith, but we are unable to discern how under this evidence these three defendants can be held either criminally or civilly for Stewart's act in retaining the money as the evidence all leaves the money in his hands. If in fact Griffith bet the money in the name of Stewart Cockrell and deposited it as a part of the stakes, and directed Stewart to hand it to Ellis, and Stewart did so and was not in the conspiracy, then he would not be guilty of the crime of larceny. But we are not passing upon Stewart's guilt or innocence further than it is necessary to inquire what evidence there is in this record of a criminal conspiracy which would render his act in

retaining the alleged indemnity deposit the act of these three defendants as his co-conspirators. Had he paid them the money after notice and demand by Griffith, it would not have released him from his liability to Griffith if the $3,000 he raised on his drafts and in cash was not bet on the admitted fake race. Griffith need not trace his title to it through any illegal act to recover that of Stewart, but it is apparent in the state of the evidence before us that Griffith has no claim even in a civil action against these three defendants. There being no evidence of a conspiracy between Stewart and these three defendants to obtain Griffith's drafts and cash, to the amount of four thousand dollars, deposited in the bank as an indemnity by Griffith, these defendants could not be lawfully convicted of larceny of Griffith's said money by Stewart's retention of the possession of said deposit, and hence there was no such taking and carrying away by them of said moneys as will support a conviction of larceny. It results that the instructions numbered 1 and 2 were erroneous in that each is predicated on a joint taking of Griffith's money by these defendants with Stewart and the Cockrells, whereas there was no evidence that these defendants or the Cockrells received said money or any part of it into their possession nor was there any such proof of conspiracy between them and J. P. Stewart that his possession could be deemed their possession.

The second instruction is open to the further criticism that it makes the guilt of the defendants depend upon the belief of the jury that the nine hundred dollars was obtained "by the means and in the manner and under the circumstances detailed by Griffith and Owens." It is equivalent to a comment that these two witnesses agreed in their evidence, but the most serious objection is that it furnishes no correct basis for a finding of guilt. It should have been that if the jury find and believe from the evidence beyond a reasonable doubt

that defendants obtained possession of the nine hundred dollars described in the evidence, the property of Monroe Griffith, by some trick, fraudulent device or artifice, with the intention at the time of stealing it and that defendants after having so obtained the possession of said $900 did appropriate the same to their own use with the fraudulent purpose of depriving said Griffith of the same, they should find them guilty of grand larceny, etc. If they did these things they were guilty of larceny whatever Griffith's intention was in depositing it. It is not clear why the instructions are limited to $900, inasmuch as the same evidence also includes the three thousand dollars secured on the two drafts. There was some evidence that at least one of the drafts was the joint draft of Griffith and Owens.

The third instruction, while correctly framed as a legal proposition, has no support in the evidence. These defendants were convicted on the evidence of Griffith and Owens, and they both positively testified Griffith did not bet a cent on the race. How then can an instruction be correctly predicated on the fact "that Griffith believing that the foot-race *would be a fair and honest race,* staked his money on the same and that defendants had previously arranged that Jerry Cockrell should beat Stewart Cockrell," etc. Griffith's evidence was that *he did not believe it would be a fair race.* He thought Ellis was being swindled and didn't tell him. He evidently thought Stewart Cockrell would win the race, *but not fairly.* He thought Jerry would throw the race. This instruction has no facts to support it.

The twelfth instruction is open to the criticism that it assumes that defendants got the $900 from Griffith whereas there is no such proof. It assumes a fact essential to their guilt and not established by the evidence. This was a fact the jury must find even if there had been evidence tending to prove it.

II. The evidence of the other fake races, boxing matches, and other disreputable practices which oc-

curred more than a year after this offense was alleged
to have been committed, was improperly admitted.

These five other cases detailed in evidence were with
different parties, *from different States, and dissimilar
in circumstances, and a year and more after this race.
"To permit such evidence would be to put a man's whole
life in issue on the charge of a single wrongful act and
crush him by irrelevant matter which he could not be
prepared to meet." [1 Bish. Crim. Proc., sec. 1124.]

"Upon the trial of an indictment for larceny, evi-
dence of the commission of a separate and distinct lar-
ceny from that charged in the indictment is inadmis-
sible." [State v. Goetz, 34 Mo. 85.]

The law of this State has been so recently re-
viewed in an exhaustive opinion by Judge Fox in
State v. Spray, 174 Mo. 569, that we deem it un-
necessary to again collect and distinguish the authori-
ties. This case falls directly within the reasoning of
the Spray and Goetz cases. It is clearly distinguish-
able from the Schnettler case, 181 Mo. 173, in which the
evidence showed a conspiracy by the same parties prior
to the alleged bribery by which those same conspirators
entered into a combination among themselves to control
legislation by the members of said conspiracy by de-
manding and receiving a bribe for the passage or defeat
of certain ordinances which might come before them to
be paid by corporations and individuals interested in
such ordinances. The corrupt agreement applied to all
matters of a similar character which would come before
the House of Delegates and the evidence offered showed
that the lighting deal was a part of the same scheme
and had a close logical connection with it and hence
formed an exception to the general rule announced in
State v. Spray, 174 Mo. 569.

It is plain that the evidence of five other distinct
larcenies committed at least a year after the offense
charged in this information and committed by different
parties under entirely different circumstances and by

different means was incompetent unless we are to entirely ignore the general rule.. "Even where offenses are of a like sort" (and that is the utmost that can be said of the five other larcenies admitted in this case) "evidence of one is not admissible in proof of another, as on a trial for larceny to show that defendant has committed other and disconnected larcenies." [1 Bish. Crim. Proc., sec. 1124, p. 697.]

III. The second count was a sufficient charge of larceny. It avers the ownership of Griffith in the form long approved at common law. In this respect it does not fall within State v. Ellis, 119 Mo. 438.

IV. The point made on the arraignment is much more plausible than sound. The defendants waived the reading of the information which included the charge of larceny and when asked by the court as to their plea of having "obtained money under false pretenses" instead of confining their plea to that charge specifically answered "they are not guilty in manner or form as charged in the information." The information charged them with larceny as well as false pretenses and by their plea they put the whole charge in issue. Perhaps there is in our criminal practice no proposition better settled by a long line of precedents than that a trial can not proceed against a prisoner for an offense for which he has not been arraigned and to which he has not pleaded not guilty. Thus where the indictment was for murder in the second degree, but the prisoner was arraigned and put on trial for murder in the first degree, the judgment was reversed. [State v. Barnes, 59 Mo. 154.] And time and again it had been ruled that where the record in this court shows no arraignment it must be reversed. [State v. Saunders, 53 Mo. 234.]

We are cited to Gaither v. State, 21 Tex. App. 527, but the record in that case shows the plea was limited to one charge. As already said we think while the entry

is unfortunate in form it sufficiently indicates the plea was to the whole information.

For the errors indicated the judgment must be and is reversed and the cause remanded for a new trial in accordance with the views herein expressed.

All concur.