HOBBS v. ROBERT BOATRIGHT et al.; EX-CHANGE BANK and J. P. STEWART, Appellants.

Division One, April 20, 1906.

1. **FRAUDULENT SCHEME: In Pari Delicto: Application of Rule.** The doctrine that the courts will not aid a plaintiff who is *in pari delicto* with the defendant, is not a rule of universal application. It will not be applied when to withhold the relief asked would to a greater extent offend public morals, or be an aid to a gang of cheating gamesters to continue their nefarious schemes.

2. ———: ———: **Public Policy.** The rule is itself based upon public policy, and what is public policy in a given case is as broad as what is fraud in a given case, and either question is addressed to the sound discretion of the court.

3. ———: ———: ———: **Plaintiff's Relief Alone: Other Transactions.** Where plaintiff entered into a dishonest scheme with a gang of gamesters to obtain money, and was caught and entrapped by them in their scheme, which was so fraudulently conducted as to make it certain that the plaintiff would lose, the

court would not listen to his prayer for relief if there was nothing in the case to make their offense more heinous than his, and if to grant him relief would amount to nothing more than to restore to him the money he has thereby lost. But if there have been other like dishonest transactions engaged in by defendants, the court will permit plaintiff to recover the money out of which he was defrauded, in order to aid in breaking up such dishonest pursuits. In such case the court interferes from motives of public policy.

4. ———: **Liability of Bank: Assistance and Assurance: Consideration: Air of Respectability.** An assurance by the cashier of a bank that a gang of schemers and gamesters "are all right," does not make the bank liable to the plaintiff for the money out of which they defrauded him, if before such assurance was given plaintiff knew from the transactions he himself had had with them and from the scheme they had entered into with him, that they were dishonest men. But where the evidence tends to show that the officers of the bank knew the business the gang of gamesters were engaged in and knew their methods of enticing and entrapping strangers like plaintiff into their nets and fleecing them, and so knowing, lent to the gang the appearance of respectability that the backing of a banking institution affords, and permitted their bank to be used to effect the exchange and transference of the money, even though the bank got nothing more out of the transaction than the exchange and the incidental bank use of the deposits, the bank will be liable to plaintiff for the amount of money out of which he was defrauded by the gang, because for a small consideration it assisted bad men to do a bad deed. The plaintiff, in such case, cannot recover from the bank on the theory that he trusted in the assurance given him by the cashier that the gang were men worthy of confidence, but becuse of the actual aid the bank, with knowledge of the facts, rendered the gang in defrauding plaintiff.

5. ———: **Evidence: Other Transactions.** Evidence of other similar transactions, in which the defendant bank allowed itself to be used to aid the fraudulent schemes of a gang of gamesters, whether they occurred before or after the transaction in question, is competent, if it tends to show a concerted plan to inveigle and defraud the unwary. It tends to show the unlawful association and the fraudulent course of dealing with the schemers and aiding them to victimize others in the same way.

6. ———: **Money Lost in Gambling: Unfairness: Nature of Action: At Common Law and Under Statute.** The petition states that the president of an athletic club and others had conspired together to have what is called fake footraces run on which strangers were enticed to bet, and that the races were so fixed

in advance that whichever racer a stranger bet on he was sure to lose; that schemes to entice strangers were devised, and that the plaintiff was caught in one of these schemes and inveigled into putting $6,000 into the hands of the president as a stakeholder on what plaintiff supposed was a race, with the result that the man he bet on, who was one of the conspirators, was beaten in the race, as it was previously agreed between him and his co-conspirators would be the case, and so the plaintiff lost his money, and that the defendant bank and its cashier aided and abetted the president and his gang in perpetrating the fraud. *Held*, first, that if the petition was intended to state a cause of action under section 3424, Revised Statutes 1899, as for money lost at gambling, it contains more than is necessary, for fraud or unfairness in the game is not essential to the action given by that statute; *second*, if there was no such statute, the petition states a right of action at common law, that is, that the president and others obtained plaintiff's money by a fraudulent scheme in which they were assisted by the bank and its cashier.

7. ———: **Assisted by Bank: Liability of Bank and Cashier.** Instructions to the effect that, if the cashier of the defendant bank knew the fraudulent scheme by which plaintiff was defrauded and aided it, he and the bank were both liable, were correct, there being no innocent stockholders to suffer.

Appeal from Jasper Circuit Court.—*Hon. Jos. D. Perkins*, Judge.

Affirmed.

*A. E. Spencer* and *W. R. Robertson* for appellants.

(1) Even though we should not be correct in our contention that there is now, as a matter of fact, as far as plaintiff is concerned, but one cause of action before this court, which is an action for fraud and deceit, yet the cause of action for money lost at gaming, if there is such a one in the petition, and one for fraud and deceit being blended together in one petition, a general verdict thereon cannot stand, and this is especially true where the testimony is such that he can not recover for fraud and deceit. Mooney v. Kennett, 19 Mo. 554; Bigelow v. Railroad, 48 Mo. 510; Pitts v. Fugate, 41

Mo. 405; Shuck v. Pfenninghausen, 101 Mo. App. 700; Owens v. Railroad, 58 Mo. 394. (2) Before the plaintiff could properly recover for fraud and deceit, it was necessary for him to allege and prove that the representations he charges against these defendants were false, that they were known to be false when made, or that they were made of the defendants' own knowledge, when in fact no knowledge or any reasonable grounds to believe that the representations were true were had, that the plaintiff had a right to and did rely on the truth of such representations and suffered damage and loss by reason of their falsity. Hamlin v. Abell, 120 Mo. 188; Edwards v. Noel, 88 Mo. App. 439; Paretti v. R'ebenack, 81 Mo. App. 498. (3) The allegations in plaintiff's petition that defendants, for the purpose of defrauding plaintiff out of his money and winning same, did, by various devices, entice and induce plaintiff to bet the sum of $6,000 on a foot race, are mere conclusions of law and the statement of pleader of his opinion on facts, real or imaginary, not stated, and are mere surplusage, and consequently would not be sufficient on which to base an action of fraud and deceit or to connect these defendants with any combination of gaming. Hoester v. Sammelmann, 101 Mo. 624; Goodson v. Goodson, 140 Mo. 218; Smith v. Sims, 77 Mo. 274; Nichols v. Stevens, 123 Mo. 117; Bliss on Code Pleading (3 Ed.), sec. 211. (4) If the petition in this case does not state facts sufficient to constitute a cause of action for fraud and deceit, or if the petition does not state sufficient facts and the evidence does not disclose sufficient facts to render the defendants liable in an action on fraud and deceit, the plaintiff, having tried the case in the circuit court upon the theory that the action was one for fraud and deceit, ignoring the theory of an action to recover money lost at gaming, can not now turn about face and contend that this judgment should be sustained upon the theory that it is an action for money lost at gaming, because no

such question was submitted to or passed upon by the trial court. All of plaintiff's instructions were on the theory of fraud and deceit. It is the duty of this court to review the rulings of that court and not to pass upon a new case. Raming v. Railroad, 157 Mo. 509; Benton Land Co. v. Zeitler, 182 Mo. 265; Seckinger v. Mfg. Co., 129 Mo. 603; State ex rel. v. Chick, 146 Mo. 661. (5) Plaintiff cannot plead one cause of action, that is, for money lost at gaming, and recover on another, that is, for fraud and deceit, as he has attempted to do in this case. Chitty v. Railroad, 74 Mo. 148. (6) If plaintiff contends here that under his petition and the evidence he was entitled to recover under the statute for money lost at gaming,then it was incumbent on him, under the most favorable view of the law, to adduce testimony and submit his instructions to the effect that there was an agreement between the defendants to divide among themselves whatever might be won from the plaintiff in the game. This the evidence wholly failed to show and the instructions wholly ignored. Laytham v. Agnew, 70 Mo. 48. (7) Conceding for the purpose of the argument that the cashier of defendant bank made the statements which plaintiff testifies he made, that Boatright was all right, yet the dealings of plaintiff with Boatright prior thereto were of such character as to convince a man of ordinary intelligence and honesty that he was not the character of man to be trusted and therefore no cause of action could be based on the alleged representations, as it is necessary that plaintiff should have been deceived and that he relied upon the representations. Priest v. White, 89 Mo. 616; Dunn v. White, 63 Mo. 186; Bartlett v. Blain, 83 Ill. 27. (8) That the court erred in admitting the testimony of other witnesses as to other alleged transactions, which they tesified to having with some of the parties who were charged with being implicated in this transaction, is amply sustained and the principles applicable thereto fully reviewed in the criminal case prosecuted

against Boatright and others, decided by this court. State v. Boatright, 182 Mo. 33. (9) Plaintiff in making out his case shows that he was *in pari delicto* with Boatright, Fisher, Wasser and associates, hence the maxim *"potior est conditio possidentis"* applies, and therefore plaintiff can not recover any sum or sums from the defendants in this case under the theory of fraud and deceit, or of fraudulent gambling transaction. Williamson v. Baley, 78 Mo. 636; Kitchen v. Greenbaum, 61 Mo. 114; Abbe v. Marr, 14 Cal. 210; Scott v. Brown, 67 L. T. R. (N. S.), 782; Ohio case reported in 22 Weekly Law Bul. 371; Morrison v. Bennett, 20 Mont. 560; Hagerty v. Storage Co., 143 Mo. 247; Sprague v. Roney, 104 Mo. 358; Hatch v. Hanson, 46 Mo. App. 330; Knight v. Lindsay, 80 Mich. 396; Shipley v. Reasoner, 80 Iowa 48; 2 Pom. Eq. Jur. (2 Ed.), sec. 942, p. 1356, n. 1; State v. Crowley, 41 Wis. 271; Tyler v. Larimore, 19 Mo. App. 458; Dent v. Ferguson, 132 U. S. 65; McMullen v. Hoffman, 174 U. S. 669; King v. Winants, 71 N. C. 472; Cooley on Torts (2 Ed.), 174. (10) It is assumed in all of the instructions given in behalf of plaintiff that whatever was done by the defendant Stewart not only rendered him personally liable, but also rendered the defendant bank responsible for his acts. The liability of the bank does not attach when it may have profited by the unauthorized fraud of its officers, unless it is shown that it did accept the fruits of the unlawful transaction with full knowledge. If, under the evidence, the jury may have suspected that the cashier was authorized to make the representations complained of, no finding could be based thereon, as conjectures, suspicions or surmises are not sufficient upon which to base a finding of fact. (11) It requires more than the proof of what the cashier did to render the bank liable, and therefore all of the instructions given in behalf of the plaintiff are erroneous on that proposition. Story on Agency (9 Ed.), sec. 115; Taylor v. Bank, 66 N. E. 726; Hummel v. Bank, 37 N. W. 954; Bank v.

Gifford, 47 Iowa 575; Mayor, etc. v. Bank, 111 N. Y. 446; U. S. v. Bank, 21 How. 360; Bank v. Dunn, 6 Peters 59.

*H. W. Currey* and *McReynolds & Halliburton* for respondent.

(1) The instructions given on behalf of plaintiff submitted the case to the jury on the theory that plaintiff lost his money at a game or gambling device—fake, simulated and pretended—but still a gaming device, as defined by sec. 3424, Revised Statutes 1899, and that the appealing defendants were liable for the loss of his money, because they conspired and confederated to, and did, in fact, aid and abet the Boatright gang to get possession of plaintiff's money, and that the simulated gambling device was gotten up expressly to induce plaintiff to bet his money and thereby enable defendants to get and convert the same. The instructions given at defendants' request submitted the converse of these propositions—and no other—(and defendants' refused instructions do not suggest the theory of fraud and deceit), and in such case, defendants will not be heard to complain, even though the recovery be upon grounds not stated in the petition. Bank v. Armstrong, 92 Mo. 279; Hilz v. Railroad, 101 Mo. 41; Johnson-Brinkman Co. v. Central, 116 Mo. 558; Phelps v. City of Salisbury, 161 Mo. 14. (2) The objection that a petition contains two causes of action improperly blended in one count must be raised by written motion (R. S. 1899, sec. 619) filed before answer or the same is waived (R. S. 1899, sec. 602) and if the single count contains the essential averments necessary for the two causes of action, directly or by necessary intendment, a motion in arrest will not reach the defect. House v. Lowell, 45 Mo. 381; O'Neal v. Blaize, 94 Mo. App. 655; Stevenson v. Judy, 49 Mo. 228; Murphy v. Railroad, 96 Mo. App. 272; Boyd v. Railroad, 108 Mo. App. 303;

Pickering v. Tel. Co., 47 Mo. 457. (3) The proper practice in cases of this kind, where two causes of action are improperly blended, is to move to require the plaintiff to elect on which cause of action he will proceed, and strike out the other one, before answer, and a motion in arrest of judgment will reach the defect only when one of the two causes so improperly blended in one count is so defectively stated that it will not support a judgment. Mooney v. Kennett, 19 Mo. 551; Kerr v. Plaff, 44 Mo. App. 29; Crystal v. Craig, 80 Mo. 367; Dry Goods Co. v. Buchanan, 79 Mo. App. 532. The motion in arrest is proper where a cause of action in equity and a cause of action at law are improperly blended in the same count because one cause is triable by the court with a jury, and the other without a jury. Tucker v. Allen, 47 Mo. 488; Myer v. Field, 37 Mo. 434; Peyton v. Rose, 41 Mo. 255; Crow v. Peters, 63 Mo. 429. And, where there is more than one separate and distinct cause of action stated in separate counts in the same petition. Boyce v. Christy, 47 Mo. 70; Owens v. Railroad, 58 Mo. 386; Biglow v. Railroad, 48 Mo. 510; Seibert v. Allen, 61 Mo. 482; Johnson v. Bedford, 90 Mo. App. 43; State ex rel. v. Peterson, 142 Mo. 526. Even if there be more than one cause of action in the petition, either in one or separate counts, if the suit admits of but one finding, and is drawn to meet the chances of proof, the motion in arrest because there is more than one cause of action, and only one finding, will not lie. Owens v. Railroad, 58 Mo. 386; St. Louis v. Allen, 53 Mo. 44; Silcox & Martin v. McKenny, 64 Mo. App. 330. The cases of Hoagland v. Railroad, 39 Mo. 451; Clark v. Railroad, 36 Mo. 202, and McCoy v. Yeager, 34 Mo. 134, holding that a motion in arrest should be sustained in a case like this, was overruled by the case of House v. Lowell, 45 Mo. 381. Bank v. Dillon, 75 Mo. 382; Pickering v. Tel. Co., 47 Mo. 457; Williamson v. Fisher, 50 Mo. 198; Fadley v. Smith, 23 Mo. App. 87. The petition in

this case does not contain two causes of action. It only contains one cause of action. It is an action for money obtained by a gaming transaction, with two grounds of recovery, one under the gaming statute where the action is brought within ninety days, and one on the theory that plaintiff's money was obtained by a pretended game, to-wit, a fake or fixed foot race, and was by that means stolen from plaintiff, and he is entitled to recover on either or both grounds. The case was submitted on the two grounds. The petition does not state an action for fraud and deceit. And the case was not tried or submitted by the attorneys or the lower court on any such theory, and no instructions were asked by defendant on any such theory of the petition or evidence. (4) The petition states a good cause of action under the gaming statutes. The statute, sec. 3424, Revised Statutes 1899, gives the right of recovery to "any person who shall lose any money or property at any game or gambling device." There are no restrictive words. The right is given in as broad language as could have been used. "Any person" means every and all persons who shall "lose any money." "Lose" is a word of general meaning, and would include money gotten from the plaintiff by theft "at a gambling transaction" as well as by a bet "at a gambling transaction." "At any game" means in or by means of "any gambling device," fake, simulated or real. Flerned v. Bergin, 2 Ired. Eq. (S. C.) 589. "Any gambling devices" means every and all "devices" pretended, feigned, simulated and fake, as well as real "gambling devices." Bank v. Davis, 73 Hun 357; State v. Haugh, 64 N. Y. 400; Leonard v. Commonwealth, 112 Pa. St. 607; Purdy v. People, 4 Hill (N. Y.) 384. And "gambling device" means that which is contrived, invented or planned, something formed by design. Smith v. State, 17 Tex. 792; State v. Blackstone, 115 Mo. 427; Portis v. State, 27 Ark. 362; Crow v. State, 6 Tex. 336. "Gaming" has no technical

meaning, and foot racing is gaming. Swaggard v. Hancock, 25 Mo. App. 596. The statute, then, gives the right of action to any person whose money or property has been gotten away from him by means of any contrivance, coming within the definition of gaming, whether the means used rendered the parties liable for larceny or only as gamblers. That the footrace was a fraudulent and fixed fake race does not hinder its being controlled by the statutes. Cutshall v. McCowan, 98 Mo. App. 702. (5) More than one right of recovery and more than one ground of recovery may arise out of the commission of a single tort. And several grounds of recovery may be commingled in one count in the petition. Davis v. Miller, 83 Fed. 982; Croft, etc., Co. v. Brewing Co., 63 Conn. 551; Sluder v. Railroad, 88 S. W. 648; Rapp v. Railroad, 88 S. W. 865. Appellants' point "six" is a gross misstatement of the law promulgated by the case of Laytham v. Agnew, 70 Mo. 48. The law of that case is that, "In the game 'poker' each party plays for himself, as was established by the evidence; and if there be no conspiracy of two or more to cheat another playing in the game, and agreement to divide between themselves any amount they should win from him, each party in the game is only liable to the loser for the amount of money he may win from him." In the game of "footrace" all betters are arranged on one of two sides, and each gambler takes the common results of his side, as shown by the evidence, and both parties tried the case on that theory. (6) If the evidence warranted the jury in finding that plaintiff demanded his money back before the race was run, then upon that ground plaintiff's recovery is right. Cutshall v. McGowan, 98 Mo. App. 702. (7) If a defendant pleads to the merits he waives everything except, first, that the petition does not state facts sufficient to constitute a cause of action; second, that the court has no jurisdiction over the subject-matter of the action. Paddock v. Somes, 102 Mo. 235. However uncertain

and indefinte a petition may be, defendant waives his objection thereto by answering over, after a demurrer or after a motion of any kind striking at the petition, and cannot have the action of the trial court reviewed. State ex rel. v. Bank, 160 Mo. 640; Bernard v. Mott, 98 Mo. App. 403; Estes v. Shoe Co., 155 Mo. 577; Riley v. Cullen, 159 Mo. 322; Duerst v. Stamping Co., 163 Mo. 607. (8) A corporation is liable for conspiracy to defraud. Alexander v. Relfe, 74 Mo. 517; Zinc Carbonate Co. v. Bank, 74 Amer. St. 845; 4 Am. and Eng. Ency. Law (1 Ed.), 592. (9) And plaintiff may recover against one or all of the defendants. 4 Ency. Pl. and Pr., 737-780. (10) (a) Where there is a conspiracy and confederation to commit larceny, one in the confederation and conspiracy, but not actually present at the taking, is guilty of larceny. Com. v. Hollister, 25 L. R. A. 349 (157 Pa. 13). (b) When two or more persons entered upon an unlawful enterprise with a common purpose to aid, assist, advise and encourage each other in whatever may grow out of the enterprise upon which they enter, each is responsible civilly and criminally for everything which may consequently and proximately result from such unlawful purpose whether especially contemplated or not, and whether actually perpetrated by all or less than all of the conspirators. Martin v. State, 18 Am. St. 91 (89 Ala. 115); 1 Wharton's Crim. Law, sec. 220. (c) Conspiracy, or a common purpose to do an unlawful act, need not be shown by positive testimony. Nor need it be shown that there was prearrangement to do the specific wrong complained of. Martin v. State, supra; 1 Bishop's Crim. Law, sec. 649. (11) It is not necessary to allege any overt act when the conspiracy to do the act is itself unlawful. Champ v. Commonwealth, 10 Am. St. 895; 4 Am. and Eng. Ency. Law (1 Ed.), 624; 10 Century Digest, column 1160; United States v. Gooding, 12 Wheat. 475; Banson v. United States, 156 U. S. 468. This being true in a criminal case, it is

much more so in a civil case, as the rule of pleading in civil cases is not so strict or technical as in criminal cases. (12) (a) The facts developed in this case show beyond question that there was an organization at Webb City under the management of Robert Boatright, engaged in running fixed or fake footraces and inducing strangers to come to Webb City in connection therewith, and inducing such strangers by various schemes and devices to part with the possession of their money in connection therewith, that no one outside of the organization ever run in any race. That the races were so arranged that the organization always won. That plaintiff was induced to put his money in a pot on a foot race, with a promise that the amount would be immediately given back to him by one of the gang, but whether he put it up that way or as a bet on the race, the obtaining of his money under the circumstances shown by the evidence was grand larceny. State v. DeFreese, 8 Am. Rep. 1; Miller v. Commonwealth (Ky.), 39 Am. Rep. 194; United States v. Murphy (Dist. of Columbia), 48 Am. Rep. 754; People v. Show, 58 Am. Rep. 372; Doss v. People, 49 Am. St. 180; State v. Shilbrick, 87 Am. St. 784; People v. Miller (N. Y.), 88 Am. St. 546; State v. Murphy, 90 Mo. App. 548; State v. Hall, 85 Mo. 669; State v. Zumbrunson, 86 Mo. 111. (b) In note 2 to case of People v. Miller, 88 Am. St. 569, the law is stated as follows: ''Where one obtains possession of property by means of fraud, or a trick, with a preconcerted design to steal property, the taking is larceny, for the fraud vitiates the transaction; the owner is still deemed to retain a constructive possession of the property, and the conversion of it by the defendant is such a trespass to that possession as constitutes larceny. Crum v. State, 148 Ind. 401, 47 N. E. 833; Huber v. State, 57 Ind. 341, 26 Am. Rep. 57; Flemming v. State, 136 Ind. 149, 36 N. E. 154; Grunson v. State, 89 Ind. 533, 46 Am. Rep. 178; Hecox v. State, 105 Ga. 625, 31 S. E. 592; People v. Rae, 66 Cal. 423,

56 Am. Rep. 102, 6 Pac. 1; People v. Montarial, 120
Cal. 691, 53 Pac. 355; People v. Tomlinson, 102 Cal. 19,
36 Pac. 506; People v. DeGraff, 127 Cal. 676, 60 Pac.
429; People v. Campbell, 127 Cal. 278, 59 Pa. 593;
Loomis v. People, 67 N. Y. 322, 23 Am. Rep. 123; Sol-
tau v. Gerdau, 119 N. Y. 380, 16 Am. St. 843, 23 N. E.
864; People v. Sumner, 33 App. Div. 338, 53 N. Y. Supp.
817, affirmed in 161 N. Y. 652; State v. Hall, 85 Mo.
669; Commonwealth v. Eichelberger, 119 Pa. St. 254, 4
Am. St. 642, 13 Atl. 422; Mitchell v. State, 92 Tenn. 668,
23 S. W. 68; People v. Camp, 56 Mich. 548, 23 N. W.
216; Frazier v. State, 85 Ala. 17, 7 Am. St. 21, 4 So.
691; Commonwealth v. Lannan, 153 Mass. 287, 25 Am.
St. 629, 26 N. E. 858; Devore v. Territory, 2 Okla. 562,
37 Pac. 1092; State v. Combs, 55 Me. 477, 92 Am. Dec.
610; Doss v. People, 158 Ill. 660, 49 Am. St. 180, 41 N.
E. 1093. So where one fraudulently obtains the pos-
session of money, agreeing to return the amount or five
times the amount in counterfeit money, and immediate-
ly appropriates it to his own use with the intent of
stealing it, he is guilty of larceny. Crum v. State, 140
Ind. 401, 47 N. E. 833. Taking possession of bills with
the supposed purpose of counting them, but really to
fraudulently retain and appropriate them, is larceny.
Hecox v. State, 105 Ga. 31 S. E. 592. Inducing one
to deposit money with a person for the purpose of get-
ting it into his possession with the intent to thereafter
feloniously appropriate it, the act of appropriation,
when accomplished, constitutes larceny. People v.
Montarial, 120 Cal. 691, 53 Pac. 355. And the volun-
tary giving of a worthless note for the money is a mere
trick to hide the defendant's real design in such a
transaction. People v. Tomlinson, 123 Cal. 19, 36 Pac.
506. Fraudulently obtaining money from a wife under
a promise to return it, or pay it to others who would se-
cure an appointment on the police force for her hus-
band, but really with the intention to steal it, is larceny.

195 Sup.—45

People v. DeGraff, 127 Cal. 676, 60 Pac. 429. Where two confederates, under the cover of throwing dice, induce another to part temporarily with his money, with the intent of keeping it, the conversion of it is larceny. Loomis v. People, 67 N. Y. 322, 23 Am. Rep. 123. One to whom personal property is delivered for a special purpose, but who intended when he procured such delivery to appropriate the property to his own use, is guilty of larceny. Soltau v. Gerdau, 119 N. Y. 380, 16 Am. St. 843, 23 N. E. 864. To obtain a deed of release under the pretense that it was for a temporary purpose only, and then putting it on record, is such a trick or artifice as amounts to a constructive taking, and is evidence of an original felonious intent. State v. Hall, 85 Mo. 669. Where one secures possession of a note he has given for sixteen hundred dollars, under the pretense of giving a new note for the same amount, but instead substitutes a note for only sixteen dollars, with the intent to defraud the bank, the offense is larceny. Commonwealth v. Eichelberger, 119 Pa. St. 254, 4 Am. St. 642, 13 Atl. 422. Getting possession of a man's horse from his son by fraudulent representation, with the intent of depriving the owner of it, is larceny. People v. Camp, 56 Mich. 548, 23 N. W. 216. To kill another's animal with the intent of stealing it and then getting the owner's consent by means of fraud, is larceny. Frazier v. State, 85 Ala. 17, 7 Am. St. 21, 4 So. 691. Obtaining possession of street cars through false pretenses, with the intent of appropriating them to the taker's own use, is larceny. People v. Lawrence, 70 Hun 80, 23 N. Y. Supp. 1095. An attorney who obtains possession of a sum of money from his client upon the false representation that it was the amount necessary to be paid for certain land, which his client desired to buy and who, after paying the real price, appropriated the balance, is guilty of larceny. Commonwealth v. Lannan, 153 Mass. 287, 25 Am. St. 629, 26 N. E. 858. A conspiracy between two persons to get money from

another fraudulently on a check with intent to steal it, is larceny. Grunson v. State, 89 Ind. 533, 46 Am. Rep. 178. The securing of possession of property by fraud, apparently for a special purpose, but really with the intent to convert it to the taker's use, becomes larceny when it is converted. Devore v. Territory, 2 Okla. 562, 37 Pac. 1092; People v. Hughes, 91 Hun 354, 36 N. Y. Supp. 493. Obtaining possession of a horse by fraudulently pretending that the taker desired to drive it to a certain place for a specified time, but in fact to go to a different and more distant place, becomes larceny if the taker subsequently converts the horse to his own use with a felonious intent. State v. Coombs, 55 Me. 477, 92 Am. Dec. 610. Compare in re Mutchler, 55 Kan. 164, 40 Pac. 283. Obtaining money under the pretense that it is bet on a race, and with the intent at the time to convert it to the bailee's own use, the race being a mere sham to aid this purpose, is larceny. Doss v. People, 158 Ill. 660, 49 Am. St. Rep. 180, 41 N. E. 1093. Some authorities, notably in New York, directly hold that where property is taken by means of some trick, device, artifice, fraud, or false pretense from the possession of the owner, it is not necessary, even at common law, that it should be taken by trespass, thus apparently dispensing with the trespass which is generally deemed essential to constitute larceny. The artifice, fraud, or false pretense is considered as being a substitute for the usual trespass. People v. Hughes, 91 Hun 354, 36 N. Y. Supp. 493; People v. Lawrence, 137 N. Y. 517, 33 N. E. 547; People v. Sumner, 33 App. Div. 338, 53 N. Y. Supp. 817, affirmed in 161 N. Y. 652, 57 N. E. 1120. Fraud supplies the place of trespass in the taking. People v. Shaw, 57 Mich. 403, 58 Am. Rep. 372, 24 N. W. 121. In other cases it appears to be held that the wrongful taking or trespass may be constructive, as where the possession is obtained by a trick or fraud. Frazier v. State, 85 Ala. 17, 7 Am. St. 21, 4 So. 691. In Commonwealth v. Lannan, 153 Mass. 287,

25 Am. St. 629, 26 N. E. 858, delivery by fraud would appear to transfer nothing but the mere custody of the property, the legal possession still being in the owner, so that the necessary trespass was committed by a felonious conversion of the property. In State v. Coombs, 55 Me. 477, 92 Am. Dec. 610, it was said that when property was obtained by fraud, the taking or trespass was continuous from the time possession was delivered up to the time of the fraudulent conversion. In Devore v. Territory, 2 Okla. 562, 36 Pac. 1092, it was said that if fraud is used in obtaining possession of property, it will be construed as a trespass. The authorities in general seem to hold that the fraud so vitiates the transaction that the owner is considered as still retaining a constructive possession of the property and a conversion of it by the taker constitutes such a trespass to this possession as makes the offense larceny. Crum v. State, 148 Ind. 401, 47 N. E. 833; Grunson v. State, 89 Ind. 533, 46 Am. Rep. 178; Elliott v. Commonwealth, 12 Buch. 176; State v. Reese, 49 La. Ann. 1337, 22 So. 378; Defrese v. State, 3 Heisk. 53, 8 Am. Rep. 1. In Williams v. State, 34 Tex. 558, it was held that in cases of fraud, the trespass, which is necessary to complete the theft, is not the original act of taking possession of the property, for that was with the consent of the owner, but it is the act of taking the property from the special custody, which has by the consent of the owner been intrusted to the thief. In whatever way the different courts may view the matter, the rule itself is clear that where one by a trick, fraud, or false pretense, obtains the mere possession of personal property with the fraudulent intent of appropriating it to his own use, the offense is larceny. The Tennessee courts, which at first denied this rule on the ground that no trespass was committed (Felter v. State, 9 Yerg. 397), now hold with the recognized rule above stated, by virtue of a statute defining larceny. Coldwell v. State, 3 Baxt. 429.'' (c) In the same case, note 4, page 573, the law is stated as

follows: ''Where a person is fraudulently induced to play at cards when he has no chance to win, the game being resorted to as a mere trick to get possession of the money, it is larceny. Hall v. State, 6 Baxt. 522. So, where two conspirators plan a betting trick for the purpose of defrauding one of his money, the offense is deemed larceny. Defreese v. State, 3 Heisk, 53, 8 Am. Rep. 1. And where the conspirators so fraudulently conduct a game of monte as to give another no chance of winning, and he parts with his money through fraud and fear, it is larceny. United States v. Murphy, 4 McAr. 375, 48 Am. Rep. 754. It would seem, therefore, that where a person loses at a dishonest betting game the game being pure bunco, not knowing it to be such, the person conducting the game is guilty of larceny. State v. Skilbrick, 25 Wash. 555, 66 Pac. 53; People v. Shaw, 57 Mich. 403, 58 Am. Rep. 372, 24 N. Y. 121; Loomis v. People, 67 N. Y. 322, 23 Am. Rep. 123; People v. Shaughnessy, 110 Cal. 598, 43 Pac. 2; Doss v. People, 158 Ill. 660, 49 Am. St. 180, 41 N. E. 1003. In these cases the innocent bettor usually intends to part with his possession merely, and not with his title. Doss v. People, 158 Ill. 600, 49 Am. St. 180, 41 N. E. 1093; People v. Shaughnessy, 110 Cal. 598, 43 Pac. 2. In considering this question of parting with the ownership of property in a sham game of cards, Judge CAMPBELL used this vigorous language in People v. Shaw, 57 Mich. 403, 58 Am. Rep. 372, 24 N. W. 121: 'There is some rather attenuated discrimination to be found in the books between such cheats, as induce a person to give temporary custody of his property to another, who keeps or disposes of it, and those whereby he is induced to part with it out and out. We do not think it profitable to draw over-nice metaphysical distinctions to save thieves from punishment. If rogues conspire to get away a man's money by such tricks as those which were played here it is not going beyond the settled rules of law to hold that the fraud will supply the place of

trespass in the taking and so make the conversion felonious.' " The notes to the above case of People v. Miller go fully into the question of the various schemes of obtaining money that constitutes larceny and especially points the various acts that take the place of the trespass in ordinary larceny and make it plain that under the law every dollar obtained by this Webb City gang was larceny pure and simple. (13) The facts in this case showing it to be a case of grand larceny, plaintiff whose money was stolen has a right to recover the same by civil action. R. S. 1899, sec. 2390; Gray v. McDonald, 104 Mo. 303. The right of action for an injury done in the commission of a felony or misdemeanor is not merged in the public offense. Revised Statutes 1899, section 1879. A criminal prosecution by the State, and a civil action for damages arising from the same act, may be carried on at the same time against the same defendant. Cooley on Torts, 88. The parties of the two actions and the redress afforded by them are different; so that according to the plainest principles of law a judgment in one proceeding is no bar to the prosecution of the other. Freeman on Judg., sec. 319; Corwin v. Walton, 18 Mo. 72. (14) The point made by appellants that their scheme was so transparently fraudulent and criminal that the plaintiff should not have been deceived into placing his money within their reach, can not avail them. Zimmerman v. Bidwell, 62 Mich. 205; Potton v. Balch, 69 Mo; Jones v. Innes, 32 Kan. 177; Loomis v. People, 67 N. Y. 322; Treacy v. Chinn, 79 Mo. App. 648; State v. Smith, 33 Am. Dec. 133; Bell v. State, 5 Sneed 507; Portis v. State, 27 Ark. 360; State v. Smith, 2 Yerg. 281; Harrison v. State, 4 Coldw. 195; Eubanks v. State, 3 Heisk. 490; State v. Hayes, 105 Mo. 81. (15) The evidence is conclusive that J. P. Stewart and the Exchange bank were in conspiracy with the Boatright gang and were aiding and assisting them in obtaining the money of parties induced to come to Webb City and engage in their games, that it was

through J. P. Stewart, as cashier of the bank and the dealings and transactions in the bank, that established the confidence necessary to induce the parties to part with their money. And the evidence is strong against J. P. Stewart showing that he knew the character of the business of the gang, and that every outsider brought in lost his money, that the gang was using the bank for the cashing of drafts, checks, etc. That Boatright and Ellis deposited money in the bank and took certificates of deposit in the name of a hired girl. That at one time the bank had an arrangement with the gang that on any drafts cashed by the bank in the footrace deals, upon which payments were stopped, the bank was to reimburse itself out of their money on deposit in the bank. That he knew of and aided in furnishing Boatright thirty one thousand dollar bills when he was to be examined at to his assets in the Jasper Circuit Court in June, 1901. (a) Those who commit torts, or assist and encourage others in so doing, are bound *in solido* for the damages occasioned by the trespass. Wallace v. Miller, 15 La. Ann. 449; Irwin v. Schribner, La. Ann. 583. (b) In Shearman and Redfield on Negligence (5 Ed.), sections 122 and 123, it is said: "Persons who co-operate in an act directly causing injury are jointly and severally liable for its consequences, if they acted in concert, or united in causing a single injury, even though acting independently of each other." Quoted and approved in DeDonato v. Morrison, 160 Mo. 591. (c) All who, with full knowledge of the facts, aid, command, advise or countenance the commission of a tort by another, are equally liable with him who commits it. 1 Waterman on Trespass, sec. 23. (d) This question of aiders and abettors of crime is well treated in note to State v. Hildreth, 51 Am. Dec. 373. (e) All persons who wrongfully contribute in any manner to the commission of a trespass are responsible as principals, and each is liable to the extent of the injury done. Cannifax v. Chapman, 7 Mo. 175; Alfred v. Bray, 41 Mo. 484;

McManus v. Lee, 43 Mo. 206.; Gray v. McDonald, 28 Mo. App. 477. (16) The admission of evidence showing transactions with other persons similar to the one with plaintiff, in which such other persons lost their money, is legitimate and proper evidence and is admissible on the following grounds, to-wit: First. To show the combination, confederation and conspiracy between Stewart, the bank, Boatright, Ellis and others. Second. To show the system and design and a general or continuous scheme to obtain the money of victims by fake or fixed footraces. Third. To show the interest or motive of defendants in the particular transaction. Fourth. To show *scienter* or guilty knowledge of Stewart and the bank. Fifth. To show that the aid given by Stewart and the bank in aiding in the obtaining of plaintiff's money was not by accident, mistake, innocent or in the usual and ordinary way of doing bank business. Sixth. To show actual knowledge of Stewart and the bank of the unlawful scheme and device of the Buckfoot gang and active aiding therein. Billings v. State, 52 Ark. 309; Howard v. State, 72 Ark. 586, 82 S. W. 201; Johnson v. State, 88 S. W. 905; State v. Adams, 20 Kan. 318; Greenleaf on Evidence, (16th Ed.), pp. 70 to 73, sec. 142; 1 Wigmore on Evidence, secs. 316-346; Wharton's Crim. Evidence, sec. 35; Stewart v. Wright, 130 Fed. 905; Oudin v. Crossman, 15 Wash. 519, 46 Pac. Rep. 1047; Bank v. McAllister (Wash.), 79 Pac. 1110; People v. Ventley, 75 Cal. 407; Ochs v. People, 124 Ill. 399, 16 N. E. 662; Hunter v. State, 157 Ind. 123, 61 N. E. 1; Smith v. State, 21 Tex. App. 107, 17 S. W. 552; Reilly v. U. S., 106 Fed. 896; Patten v. Gurney, 17 Mass. 182; Percival v. Haines, 142 Pa. St. 369; Worth v. McCoy, 87 Iowa 54. (17) In a conspiracy each conspirator loses his individuality and becomes identified with the crime and with the criminal with whom he is associated. U. S. v. Lancaster, 44 Fed. 902; Wells v. Adams, 88 Mo. App. 227; Shubert v. Clark, 49 Minn. 320. It will be contended also that the record is barren of any testi-

mony showing that the Stewarts or the bank received
any benefiit from these transactions.  We think that it
is fairly inferable that they did receive some benefits,
because it is inconceivable almost that men would go to
the extent that these defendants went to protect, shelter
and assist a gang of thieves without some benefit to
flow to them therefrom.  However, it is held that a con-
spirator is none the less liable because he expects to
derive no benefit from the wrong.  Felsenthat v. Thie-
ben, 23 Ill. App. 569; Bredlove v. Bundy, 96 Ind. 319;
Jerigan v. Wainer, 12 Tex. 189; People v. Daniels, 105
Cal. 262, 38 Pac. 720; Martin v. Leslie, 93 Ill. App. 44.
(18) The enforcing an illegal contract and ascertaining
the title to money growing out of it, are distinct and
separate.  So held by the Supreme Court of the United
States and by various state courts.  Brooks v.
Martin, 2 Wall. 70; McBair v. Gibb, 17 How.
232; Pullman Palace Car Co. v. Central Trans-
portation Co., 171 U. S. 151; Catts v. Phalen & Morris,
2 How. 376; Phalen v. Clark, 50 Amer. Dec. 253 (19
Conn. 421); Zimmerman v. Bidwell, 62 Mich. 205; Jones
v. Innes, 32 Kan. 177.  In this case Hobbs is not trying
to enforce any illegal contract, but is trying to recover
his money which defendants obtained by means of it,
and in contravention of what they claim was the con-
tract.  Where one person delivers property (or money)
to another for a certain purpose, which is unlawful, the
latter does not thereby authorize him to convert the
property to his own use, but trover will lie for it, al-
though the contract under which it was delivered is
illegal.  Wright v. Stewart, 190 Fed. 905; Hall v. Cor-
corran, 107 Mass. 256; Portsmouth Brewing Co. v.
Mudge, 64 N. H. 46; Bernard v. Taylor (Oregon), 18
L. R. A. 859; Loomis v. People, 67 N. Y. 322. (19) Money
won by cheating at any kind of a game, whether allowed
or forbidden, or money obtained by means of jugglery,
trick, device, scheme, or fraud, and paid by the loser
may be recovered back in a suit by such loser.  Wright

v. Stewart, 190 Fed. 905; Loomis v. People, 67 N. Y. 322; Webb v. Fulchrie, 40 Amer. Dec. 119 (3 Ired. 485); Criswell v. Gaston, 5 Mart. (N. S. La.) 130; Warden v. Plummer, 4 Jones (N. C.) 526; In matter of Arnold, 133 Fed. 789; Smith v. Blachley, 68 Am. St. 887, 188 Pa. St. 550; Haynes v. Rudd, 3 Hun 237.

VALLIANT, J.—This is a suit to recover the sum of $6,000 which the plaintiff avers was obtained from him by defendants Boatright and others by means of a fraudulent scheme in which they were aided and abetted by the defendants the Exchange Bank and Stewart its cashier.

The evidence shows that the plaintiff was enticed from his home in Oklahoma by the allurement of a scheme in which he was made to believe he would assist his tempters in obtaining money from other persons by means of inducing them to bet on a foot race to come off at Webb City, which race was to be so fraudulently conducted as to make it sure the other persons would lose. Plaintiff yielded to the temptation, went to Webb City, put up his money and lost, and then and there discovered that the supposed victims, in the defrauding of whom he was going to assist, were partners with his tempters in an organized gang of cheating gamesters; that this gang had been operating in this maner at Webb City for a considerable time, had victimized others in the same way, and that the band and its officials had knowledge of the conduct of these men, connived at their nefarious schemes and assisted them in it, to the extent, at least, of allowing the bank to be used to give the appearance of respectability and responsibility to Boatright and the other members of the gang. The trial resulted in a judgment against Boatright and his associates, and also against the bank and its cashier Stewart who alone have appealed and who are presumably the only ones out of whom the amount of the judgment could be realized.

I. The difficult question in the case is, upon which side of this controversy should the law of public policy be applied? Plaintiff schemed with men, as he supposed, to defraud others; his only disappointment was that the men with whom he thought he was scheming had readily schemed to defraud him and they did fleece him to the sum of $6,000. If we should now say to the plaintiff, you cannot recover because, although you did not accomplish what you intended, yet your purpose was to assist those men to defraud others, and therefore you are as guilty as any of them, we would by so saying allow the gang and their aiders and abettors to go free, retain the booty and set their traps again. The doctrine that courts will not aid a plaintiff who is *in pari delicto* with the defendant is not a rule of universal application, it is based on the principle that to give the plaintiff relief in such case would contravene public morals and impair the good of society; therefore, the rule should not be applied in a case in which to withhold the relief would to a greater extent offend public morals. To promote the good of the public is the highest aim of the courts in the application of this doctrine. Under the head of exceptions to the rule in 9 Cyc., p. 550, it is said: "Although the parties are *in pari delicto*, yet the court may interfere and grant relief at the suit of one of them where public policy requires its intervention, even though the result may be that a benefit will be derived by a plaintiff who is in equal guilt with the defendant. But here the guilt of the parties is not considered as equal to the higher right of the public; and the guilty party to whom the relief is granted is simply the instrument by which the public is served." A question of what is public policy in a given case is as broad as a question of what is fraud in a given case and is addressed to the good common sense of the court.

In that view of the question it becomes proper for us to state a little more fully than we have above stated the facts which the evidence in this case discloses.

For several years prior to the date of the plaintiff's troubles, there existed an organization in Webb City calling itself the Webb City Athletic Club, and professing to be composed of wealthy miners and other responsible business men in that vicinity who were fond of athletic sports and desired to give encouragement to such in a highminded way. That is what they said of themselves; in the community, however, they were generally called the "Buckfoot gang," and were understood as being engaged in promoting foot races in which they arranged with the racers in advance of the race, which one was to win. The reputation of the gang was such that bettors on the races could be obtained only from outside of that community, and in order to allure victims into their net emissaries were sent out who told seductive stories that appealed strongly to men to whom the hope of obtaining a dishonest gain with seeming immunity from punishment, was a temptation. Two of these emissaries, Wasser and Fisher, found the plaintiff in his home in Oklahoma and told him their story, which in effect was that Wasser had been running races for this athletic club, had won many races and much money for the club, but had not been treated fairly by them, had not been given his fair proportion of the money won; that it was arranged between him and Fisher that they would be the competing champions in a race to be run, the club men would, as usual, bet on Wasser, their favorite, and he would allow Fisher to beat him, and thus Wasser, who was a poor boy and had a father to take care of, would be enabled to get back from the unjust members of the club money that he had really earned, but which had been so unjustly withheld from him; that Mr. Boatright, who was the president of the club, knew of the scheme and would secretly aid them in accomplishing its purpose, but that he would have to act secretly lest the members of the club and the betting public would suspect something, therefore it was necessary to have an entire

stranger who would be the ostensible bettor on Fisher. In the beginning the proposition contained no suggestion that the plaintiff would put up any money of his own on the race, but he was asked to bet only the money that would be given him by Boatright after he got to Webb City. Nevertheless it was adroitly suggested that it would give a much better air to the whole project if the plaintiff could carry with him a letter of credit from the bank in his home town to exhibit to a bank in Webb City and thus show that he was a man of substance at home. According to the testimony given by the plaintiff himself he was not promised any share of the money to be won but went into the scheme for pure benevolence for poor Wasser whom, however, he had never seen before. Plaintiff's testimony would have been more candid if he had owned up to an agreement to share in the gains with Wasser, or had given a more plausible reason for taking the letter of credit with him. But the jury were doubtless right in giving credence to his story on the whole, making allowance for the natural reluctance of confessing one's own guilty motive.

The tempter came to the plaintiff on Friday and found him at first reluctant to take part in the fraudulent scheme, but the plaintiff, after holding the proposal in the balances, between an inclination to do right and a temptation to do wrong, until the following Monday morning, yielded and went to Webb City armed with his letter of credit.

They arrived in Joplin early in the morning and after breakfast at the hotel Fisher went with plaintiff to the park lying between Joplin and Webb City where Wasser with Boatright met them. Boatright told the plaintiff the same story that Wasser had told him. Boatright gave plaintiff $2,650 and instructed him to go the Exchange Bank and deposit it, and show his letter of credit to the bank cashier, and then to go over to a barroom just across the street. Fisher went with plaintiff to point out to him the bank; plaintiff depos-

ited the money Boatright had given him, showed his let-
ter of credit and told the cashier he was having a little
deal with the athletic club and Mr. Boatright; the
cashier told him if he wanted any money on his letter
of credit he could get it. He asked the cashier if Mr.
Boatright was a reliable man and the cashier answered
that he was.    Then, according to the program Boatright
had given him, he and Fisher went across the street to
the barroom and, as instructed by Boatright, plaintiff
asked the barkeeper, "Have you a sprint in town?"
Whereupon the barkeeper answered yes, and called up
Boatright and others and introduced them to the plain-
tiff, plaintiff and Boatright both acting as if they had
not met before. The conversation then turned on the foot
race and many men seemed anxious to bet on Wasser;
they all went up stairs to what they called the clubroom
and then and there was some fine acting, manifesting
enthusiasm to bet, which enthusiasm was increased
with some apparent intoxication; plaintiff crossed
over to the bank, drew money, returned and put it up
in Boatright's hands as stakeholder; the money so put
up was quickly covered in sums of $500 or more by the
apparently enthusiastic bettors on Wasser, and more
money was needed by plaintiff to cover the demands;
he went again to the bank and drew some of his own
money and put it up and it was quickly covered.   Then
a seeming dispute arose by one man insisting that he
had put up more money in the hands of Boatright as
stakeholder than Boatright acknowledged, and insisted
on a count of the money in the stakeholder's hands; the
excitement appeared to be great, the plaintiff was given
quietly to understand that in passing the money to and
fro between the bank and Boatright, the stakeholder,
some mistake had been made, and he was $3,000 short
on stake money and that the man demanding a count
was a dangerous one to encounter when angry, that
bloodshed was likely to ensue and that in the affray all
the money in the hands of the stakeholder would be

taken; that the only safety was for the plaintiff to draw $3,000 more of his own money and put it in Boatright's hand, who assured him positively that he would return it to him as soon as the race, which they had fixed to win, was over. The result was the plaintiff went again to the bank, told the cashier, "We got mixed over there and the boys were in trouble and I would have to draw the other money. I said, 'Do you think those fellows are all right?' He says, 'Yes,' and we went to work and fixed up a draft." Plaintiff then drew $3,000 more of his own money, went back to the saloon and gave it to Boatright; then the storm subsided, they all went to the park, the race was run, and the man that plaintiff bet on was beaten. Plaintiff demanded his money of Boatright, but the latter said he was only a stakeholder, had no control of it, that he was a ruined man—had disgraced his old father and would have to leave the country. He told the plaintiff that there was one way in which he could get even: that was to go back to Oklahoma and find wealthy cattlemen there whom he could inveigle into the same trap in which he had been caught, and they would give him forty per cent of the booty, but plaintiff declined the proposal. Plaintiff got home the next evening and the following morning went to the bank on which he had drawn, in hopes to stop the payment of his checks, but it was too late: they had been forwarded immediately from Webb City, and were presented and paid the day before plaintiff arrived.

The evidence shows that this Buckfoot gang had been engaged in practices of this kind for years, and this bank and its cashier had allowed it to be used to the extent at least that it was used in this instance, giving the gang, to strangers, the appearance of being backed by a respectable financial institution. The testimony is quite voluminous in its history of these nefarious practices running through several years before this plaintiff was victimized and it tends to show that in all the cases the defendant bank and its officers had

such connection with the transactions that they could not have helped knowing the nature of the practices and knowing that when the plaintiff presented his letter of credit and when he drew his checks he was going to be robbed of his money.

One of the cases growing out of these practices was tried in the U. S. Cir. Ct. S. W. D. of Missouri, where the evidence on this point was practically the same as in the case before us. [Wright v. Stewart, 130 Fed. 905.] In that case Judge PHILLIPS, in a summary of the evidence, shows the conduct of this gang for years in such a light as to make it a matter of astonishment that it could be tolerated for so long a period in a civilized community.

Coming back now to the law question in the case and considering it in its application to the particular facts we are dealing with, does public policy require us to turn this plaintiff away because he was, in the single transaction in question, as guilty as the men who defrauded him? Will it contravene good morals or degrade the courts if we listen to this plaintiff with his confession of guilty purpose and if, notwithstanding his guilt, we give judgment in his favor against this gang of bad men who had been preying upon the community for years and who by playing upon this man's cupidity had tempted him beyond his power to resist? Will we promote good morals to say to this gang and their friends and abettors, you have so debauched and degraded your victim that the law will not touch him or hear his complaint, therefore you may go free, keep what you took from him, and look out for another victim?

Before answering these questions we ought to consider the spirit rather than the letter of the law, and keep in view the purpose it was designed to accomplish. Whilst the principles on which this law is founded are never to be violated and the purpose of the law is never to be defeated, yet, in its application to the facts of a

given case, courts are not circumscribed by inflexible rules, but exercise a large judicial discretion.    The doctrine has several times been before this court and has been considered in that light.

In Kitchen v. Greenabaum, 61 Mo. 110, the plaintiff owned a lottery ticket which had drawn a prize of $600, a fact known to defendant, but unknown to plaintiff; defendant deceived the plaintiff by telling him his ticket had not drawn that prize, and having induced the plaintiff to believe that his ticket was of little if any value, bought it of him for $5, and collected the $600 prize.    The court held that the plaintiff could not recover because he was guilty himself of violating the law in buying the lottery ticket.    In the opinion, after quoting the maxim, *in pari delicto, potior est conditio defendentis et possidentis,* as containing the law of the case, the court, per SHERWOOD, J., said that the maxim was not of universal application, and as an example of the exceptions he said:  "Where the parties to the transaction, although concurring in the illegal act, are regarded as not equally guilty, in consequence of fraud, oppression, imposition or hardship, practiced by one party upon the other, thereby obtaining an unconscionable advantage.    Under such circumstances, courts of equity have not hesitated to interfere in behalf of the less guilty party, and against the chief mover in the unlawful enterprise."    The writer of that opinion then proceeds to say *arguendo* that the exceptions do not apply to a case involving moral turpitude, but only to an act *malum prohibitum.*

In Green v. Corrigan, 87 Mo. 359, plaintiff claiming to have been a partner of defendant in a certain contract with a waterworks company under which the works were built, sued to recover his share of the profits; it turned out in the evidence that the plaintiff was the attorney of the waterworks company, and was intrusted by his client to fix the price to be agreed on for

195 Sup.—46

the work, and without his client's knowledge made the contract with defendant for a share of the profits. There was a case of moral turpitude, yet the court held that the defendant was not equally guilty with the plaintiff, and therefore he was allowed to plead the illegality of the contract in his defense and thereby defeat the recovery.

What was said in the opinion in Kitchen v. Greenabaum, correctly expressed the law of that case, but what was there said in reference to the distinction between a transaction that was only *malum prohibitum* and one that was *malum in se* was not necessary to the decision because there was no question of that kind in the case.

In Green v. Corrigan which, as we have seen, involved a transaction *malum in se* and in which the defendant was allowed to plead the illegel contract and escape liability on the ground that the plaintiff was more guilty than he, the decision in Kitchen v. Greenabaum was referred to and approved; evidently, however, what was said in the former case apparently limiting· the exception to the rule to acts *mala prohibita* was regarded as *obiter*.

There are other decisions of this court on this subject cited in the briefs (Poston v. Balch, 69 Mo. 115; Williamson v. Baley, 78 Mo. 636; Sprague v. Rooney, 104 Mo. 358; Bell v. Campbell, 123 Mo. 1; Haggerty·v. Storage Co., 143 Mo. 247); but it would render this opinion too long to discuss them. In all of those decisions this court has treated the law of this subject on the principle that it is designed to promote public morals and the public good. Courts treat the less flexible Statute of Frauds as designed to prevent fraud and refuse to apply it when to do so would promote fraud. So with this rule of law; it should never be applied when to do so would be detrimental to public morals.

This is the view of the most distinguished law-writers. In 1 Story's Eq. Jur. (13 Ed.), sec. 300, it is said: "And indeed in cases where both parties are *in delicto,*

concurring in an illegal act, it does not always follow that they stand *in pari delicto;* for there may be, and often are, very different degrees in their guilt. . . . And besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be." Was there ever a better opportunity for a court to punish the flagrantly guilty and set a wholesome example before the community than is afforded in this case? It may be difficult to apply the criminal law to such men, but sometimes requiring them by a civil suit to make good the losses that they have caused, or helped others to cause, is a better punishment than the prison affords.

In 2 Pomeroy's Eq. Jur. (3 Ed.), sec. 940, after stating the general rule that no action arises, in law or in equity, from an illegal contract, the author says: "The rule has sometimes been laid down as though it were equally universal, that where the parties are *in pari delicto,* no affirmative relief of any kind will be given to one against the other. This doctrine, though true in the main, is subject to limitations and exceptions which it is the special object of the present inquiry to determine." Then in section 942 he says: "Lastly, when the contract is illegal, so that both parties are to some extent  involved in the illegality—in some degree affected with the unlawful taint—but are not *in pari delicto*—that is, both have not, with the same knowledge, willingness and wrongful intent, engaged in the transaction, or the undertakings of each are not equally blameworthy . . . . Such an unequality of condition exists so that relief may be given to the more innocent party in two distinct classes of cases: 1. It exists where the contract is intrinsically illegal, and is of such a nature that the undertakings or stipulations of each, *if considered by themselves alone,* would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction, and

affecting the relations of the two parties, which render one of them comparatively free from fault.''

If the case at bar disclosed but one transaction, if we should shut our eyes to the other transactions of like character that distinguished the history of this Buckfoot gang, if our whole attention was confined to the scheme entered into by the plaintiff with Wasser and Fisher in Oklahoma and the denouement at Webb City, we could not say that one was less guilty than the other; it was a scheme of dishonest purpose and there is no justification or palliation of it, and if there was nothing else in the case to make the offense of one more enormous than the other we would not listen for a moment to the plaintiff's prayer for relief, and if we do listen to him and grant him what he asks it it not through any consideration of wrongs suffered by him but in tender consideration for the welfare of that community whose laws have been defied, and whose public morals have been shocked by this gang of bad men and to bring them to the bar of justice.

The learned law-writer whose text we have last above quoted, in section 941, says: ''To the foregoing rules there is an important limitation. Even where the contracting parties are *in pari delicto,* the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him.'' In the case before us we hold that public policy is advanced by allowing the plaintiff to recover the money of which he was defrauded.

II.   There is no evidence that Boatright or any of his gang divided the money obtained from the plaintiff with bank or its officers. If such was the fact it would in the very nature of the case be out of the power of the plaintiff to prove it. But the evidence tends to show that the officers of the bank knew the business

these men were engaged in, knew their methods of enticing strangers into their net and fleecing them, yet knowing all this lent to the gang the appearance of respectability that the backing of a banking institution afforded. With this knowledge they allowed their bank to be used to effect the exchange and transference of money. If they got nothing more out of it than the exchange and the incidental bank use of the deposits they assisted bad men to do a bad deed for a small consideration.

We attach no importance to the fact that the cashier assured the plaintiff that Boatright and his associates were honorable men; because before the plaintiff went to the bank he knew from the transaction he himself had had with these men and the scheme they had entered into with him that they were dishonest men, and therefore the banker could only enlighten him as to their financial ability, unless purchance his inquiry was to learn if they possessed that quality which the learned counsel for appellant in their brief designates as "honor among thieves," a quality which the law does not recognize. It is not, therefore, on the theory the plaintiff trusted in the assurance given him by the cashier that these men were worthy of confidence, but because of the actual aid the bank, with knowledge of the facts, rendered this gang in fleecing the plaintiff.

III. There were a number of other similar transactions that had previously occurred in which the evidence tended to show that the bank allowed itself to be used to aid these men and of which it was notified by the victims as soon as they realized the fraud, which unfortunately for them, as it was also for this victim, owing to the expedition with which the checks had been forwarded by the bank for collection, was just too late to stop payment of the checks. It is urged for appellants that the introduction of evidence relating to other previous transactions of like character was erroneous.

That testimony bore directly on the issue respecting the knowledge of the bank officers of the methods and course of conduct of these men, and it points to the fact that when the bank cashed the plaintiff's checks, gave him the money and rushed the checks off for collection, its cashier knew or had every reason to believe that that was then presently going to occur which directly afterwards in fact did occur.

Some of the other similar transactions shown in the evidence occurred after the one in question in this case, and it was insisted that because they were of subsequent occurrence it was error to receive the evidence. There is some plausibility in that objection, but the evidence as affecting the issues in this case is not to be condemned as illegal by reason of what this count said in State v. Boatright, 182 Mo. 33, on which appellant relies. In that case Boatright, Ellis and Brumley, three of the gang, together with Stewart, the cashier of the bank, were indicted for grand larceny; a severance and change of venue were granted, Boatright, Ellis and Brumley's case was sent to Lawrence county, and Stewart's to Barton county. The three former were convicted and sentenced to a term in the penitentiary and the cause came here on their appeal. The evidence showed that the injured man in that case had voluntarily deposited the money in the bank. This court said: "The first and most serious difficulty we encounter on this record is whether there was any evidence of a taking and asportation by these three defendants of the money alleged to have been deposited by Griffith with Stewart, or the bank of which he was cashier." Then the court said that since Griffith voluntarily deposited the money in the bank there was no trespass and that there was no evidence that the bank's possession was changed by turning the money over to these three defendants. So it was as bearing on the question of the taking and carrying away by the three

defendants of the money deposited in the bank that this court held that the evidence of other transactions of similar character was not admissible, but we have no such narrow issue here.   Here the charge is that Boatright and his associates obtained the plaintiff's money by fraud, and that the bank and its cashier aided them. Evidence of similar transactions preceding and following the one in suit in such regular course as to show a concerted plan and an established scheme to inveigle and defraud the unwary is competent, because it tends to show the unlawful association and the fraudulent course of business.   And in this case it tends to show that the bank through its officers knew the character of transactions their co-defendants were practicing, and it throws light on their motive and their plea of innocent banking in this transaction when it shows that after they knew that this plaintiff had been foully dealt with they went on in an even course dealing with these men and aiding them to victimize others in the same way.   The testimony also bears on the question of public policy which we have above discussed.   In the brief for respondent will be found a collection of authorities which sustain the ruling of the trial court in admitting this evidence.

IV.   There is a good deal of discussion in the briefs as to the name to be given to the cause of action stated in the petition, whether we should call it a suit under section 3424, Revised Statutes 1899, to recover money lost in gambling, or one at common law for money obtained through fraud and deceit, or money obtained by defendants in the perpetration of a crime under section 2390, Revised Statutes 1899.

The petition states in substance that the defendants Boatright and others had, prior to the grievance complained of, conspired to have what it calls fake foot races run at Webb City on which strangers were enticed to bet and that the races were so fixed in advance

that whichever one of the racers a stranger should bet on was sure to lose, that schemes to entice strangers were devised, and that plaintiff was caught in one of these schemes and inveigled into putting $6,000 into the hands of Boatright as stakeholder on what plaintiff supposed was a race, with the result that the man he bet on, who was one of the conspirators, was beaten in the race, as it was previously agreed between him and his co-conspirators he would be, and so plaintiff lost his money, and that the defendants, the Exchange Bank and J. P. Stewart, aided and abetted Boatright and his gang in perpetrating the fraud.

If the petition was intended to state a cause of action under section 3424 as for money lost at gambling, there is a good deal more of it than necessary. Fraud or unfairness in the game is not essential to the right of action given by that statute; and on the other hand, if there was no such statute the petition states a right of action at common law, that is, that defendants Boatright and others obtained the plaintiff's money by a fraudulent scheme in which they were assisted by the bank and its cashier Stewart. That is what the petition means.

V. Appellants contend that since the case was submitted to the jury on the theory that it was an action for fraud and deceit, the bank and its cashier cannot be held on the evidence tending to show that they represented to the plaintiff that Boatright and his associates were honorable men and worthy of trust, because they say the plaintiff knew to the contrary, and therefore could not have been misled thereby to his disadvantage.

We have already said that we attach no importance to that evidence, and it is not on that theory that we hold appellants liable, but because the evidence tends to show that they lent their influence and gave material

aid to assist Boatright and the others in doing what they did, well knowing their scheme. If that is so, then they are liable as participating in the fraud committed by Boatright and his crew.

VI.   Appellants complain that the instructions given at the request of the plaintiff assume that whatever defendant Stewart, the cashier, did, rendered not only himself but the bank also liable.

The instructions are to the effect that, if the plaintiff was defrauded, in the manner hereinbefore indicated, by Boatright and the others, and the cashier of the bank knew their scheme and assisted them in the manner indicated to operate it, he and the bank were both liable.   There is nothing wrong in the instructions in that respect.   The aid given, according to the evidence, was the aid of the bank; it was banking business, first receiving the money which Boatright gave plaintiff with which to open the account, then cashing the checks covering not only that money but also $6,000 of plaintiff's money besides, and rushing the checks off for quick collection knowing all the while, as the evidence tended to show and as the instructions required the jury to believe before they could hold appellants liable, that plaintiff was putting his money into the hands of men who were deceiving him.   In that matter defendant Stewart acted *ex officio,* he was *pro hac vice* the bank, and whilst he cannot take refuge in the corporation to avoid his own personal liability, yet his act was the act of the bank, and it, too, is liable.   [National Bank v. Graham, 100 U. S. 699.]   We are not now dealing with a bank where there are innocent stockholders to suffer; this bank was owned and managed by the three Stewarts, two brothers and a cousin, and if the plaintiff's testimony is true they all had knowledge of the Buckfoot gang and their practices.

We have been favored with very able briefs by the learned counsel on both sides of this controversy and we are tempted to refer to many of the cases cited and discuss them, but it would make this opinion too long.

We find no error in the record. The judgment is affirmed.

All concur.